IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

JORDAN V. TYSON FRESH MEATS

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

ONEYDA JORDAN, APPELLANT,

V.

TYSON FRESH MEATS, INC., APPELLEE.

Filed October 15, 2019.    No. A-19-004.

Appeal from the Workers' Compensation Court: JULIE A. MARTIN, Judge. Affirmed.

Jon Rehm, of Rehm, Bennett, Moore, Rehm & Ockander, P.C., L.L.O., for appellant.

Dallas Jones and Eric J. Sutton, of Baylor Evnen, L.L.P., for appellee.

RIEDMANN, BISHOP, and ARTERBURN, Judges.

BISHOP, Judge.

## I. INTRODUCTION

Oneyda Jordan was injured during the course of her employment with Tyson Fresh Meats, Inc. (Tyson), on August 7, 2013. Although she was awarded a 3-percent permanent partial disability for each of her hands, she challenges the Workers' Compensation Court's finding that she was not entitled to be compensated for a loss of earning capacity as a result of her bilateral hand injuries in accordance with Neb. Rev. Stat. § 48-121(3) (Reissue 2010). We affirm.

## II. BACKGROUND

### 1. INJURY AND CLAIM

Jordan has worked at Tyson in various capacities since 2012. She sustained injuries arising out of and in the course of her employment with Tyson on August 7, 2013. On that day, she reported pain in her bilateral shoulders down to her hands and was assigned restrictions for the performance of her duties. She was later diagnosed with carpal tunnel syndrome, and eventually

- 1 -

underwent carpal tunnel release surgeries in December 2016. In February 2017, she was placed at maximum medical improvement (MMI) and she was released to return to work without restrictions; a 3-percent impairment rating was assigned to each hand/wrist. She subsequently continued to complain of pain.

On May 25, 2017, Jordan filed a petition in the Workers' Compensation Court seeking compensation for injuries sustained in the course of her employment with Tyson on August 7, 2013. Specifically, she claimed injuries to her bilateral hands, bilateral elbows, bilateral shoulders, back, and legs. She sought temporary and permanent disability benefits, payment of medical expenses, vocational rehabilitation benefits, and waiting time penalties, attorney's fees, and interest. In its answer, Tyson generally denied Jordan's allegations.

## 2. TRIAL

Trial was held on August 28, 2018. Jordan testified in her own behalf with the help of an interpreter, Tyson called three witnesses, and various exhibits (including medical records and notes) were received into evidence. Since the only issue on appeal relates to compensation for Jordan's bilateral hand injuries, we limit our discussion of the evidence accordingly.

### (a) Jordan's Testimony

Jordan started working for Tyson in 2012, when she was hired to "trim snouts" and used a Whizard knife. Jordan explained that the Whizard is "an apparatus that is electric and it vibrates," and "it's a very repetitive motion." While doing the "trim snout" job, she started to feel numbness in her fingers, then both hands, then up her arms. She eventually went to a new job at Tyson, trimming necks. In that position, she used a knife, but not a Whizard; however, her arms and hands did not feel better.

In 2013, the pain was "very strong." Her pain got worse, and in 2016, Dr. Nicholas B. Bruggeman performed surgery on her hands. After her surgery, Jordan went to a packing position at Tyson (the position she had at the time of trial); her job title was box variety meats. In the box variety meats job, "[Y]ou have to do about 1500 boxes a day, more or less." However, a supervisor testified that Jordan had to fill "maybe 350 or so" boxes in a day. Jordan testified, "They send them down to me, I scan them, and then I put the ice on them. And then I have to push them so that they go into the cooler." That job caused her "[a] lot" of pain, but she "need[ed] to work." She agreed that the box variety job was physically easier for her to do than the trim neck job. According to Jordan, the box variety job paid less than the knife jobs she worked (there is nothing in the record to show the pay rates for each job).

Jordan was given a shot by Dr. Bruggeman in April 2017, and in September, "he checked [her] hands" and he gave her a shot. She acknowledged that she had not tried to see a doctor about her hands and arms since September 2017. When asked if she treated her pain at home, Jordan said, "I put heat on them, I put hot rags . . . on them, and then when I take a bath, I take very hot baths. I put gel on, and then I use my braces [given to her by doctors] when I go to sleep." She also took various medications, "the strongest kinds of medicines that you can get for pain."

Jordan claimed her injuries have affected her day-to-day life. She stated, "[B]ecause my hands don't work, I have to pay people to do things. I have to pay someone to cut my grass and I have to pay someone to put away my shopping and my food. I'm not able to do things like I used

to be able to do." On cross-examination, Jordan noted having surgery on her right hand on December 5, 2016, and surgery on her left hand on December 19. She testified "the surgeries didn't help me at all," "[m]y hands are the same as they were before the surgery." When asked if the surgeries made her hands feel worse, Jordan responded, "Yes."

At the time of her deposition on September 12, 2017, Jordan rated her left hand pain a 10 (the worst she could imagine), and said that both hands hurt equally. Tyson's counsel stated that in her September 2017 deposition, he asked Jordan what her hand problems prevented her from doing and her answer at the time was, "'I can't do anything. Everything I drop. I don't have strength. Sometimes when I get out a glass to drink water or soda or whatever it may be, the glass slips or I drop it and it breaks. The same thing with plates, I can't pick up bags from Wal-Mart or anything.'" When counsel asked Jordan if that was still how her hands were at the time of trial, Jordan responded, "They hurt me more." Tyson's counsel then stated that in the September 2017 deposition, he asked Jordan if she did her own grocery shopping and that Jordan's response was "yes, but with [friends] who come[] with her," and that she was not able to carry groceries into her house from the car, so her friends helped her take the groceries in. When asked at trial, if since September 12, 2017, she had been unable to carry groceries into her house from the car or from the store, Jordan said "they continue helping me always." When asked if that was because she was not able to do that, she said, "Yes." However, a surveillance report and video recording was received into evidence and revealed that on September 22, 2017, Jordan was "carrying a plastic sack of unidentified items in each arm and hand" for 10 blocks." And on October 4, she carried "a large plastic sack of unidentified items" in her right hand from a car to her residence.

(b) Testimony of Tyson Employees

*(i) Nurse Manager at Tyson*

Ann Farrar is a nurse manager at Tyson. She oversees the nurses' station and assists with "work comp claims." She "attend[s] appointments with the team members, explain[s] medical terminology to them, get[s] them assigned to the appropriate jobs, review[s] any temporary/permanent restrictions, all those kind of things." Farrar has been involved in Jordan's claims of pain going back to 2013.

Following Jordan's surgeries in December 2016, Dr. Bruggeman released Jordan to go back to work following an appointment on February 27, 2017; she was released to return to full-duty work. Prior to that appointment, Jordan had a "permanent restriction of no Whizard knife." Jordan asked for that restriction to be lifted because she wanted to bid on other jobs in the plant, "and [Dr. Bruggeman] told her full duty, any job you want to do." When asked if Jordan had done the Whizard knife job since March, Farrar responded, "Not to my knowledge."

According to Farrar, after Jordan's surgeries in December 2016, "when [Jordan] was not getting along with her coworkers" and "when she was not able to move to different jobs," "she would come to the nurses and state her hands hurt"; Jordan would not complain of hand problems when she was getting along with her coworkers. In September 2017, Jordan asked to go back to Dr. Bruggeman. Farrar believed the request was made because Jordan was upset "over the ice pellets" used in the box variety meats. Jordan preferred to use the pellet ice as opposed to the cubed ice, even though according to Farrar, "[t]hey weigh exactly the same." When Jordan was sent to

Dr. Bruggeman, he requested a functional capacity evaluation (FCE), and while that was pending he put Jordan on some temporary restrictions. However, despite being told to perform work with the restrictions, Jordan was caught working her full-duty job of box variety meats. Farrar testified, "I asked [Jordan] why she was breaking her temporary restrictions, and she told me she was getting along well with her coworkers and felt great and had no pain, so she went and did her full-duty job." After September 2017, Jordan did not come to the nurses' office complaining of any physical problems with her hands until just before trial.

### (ii) Jordan's Supervisor

Gustavo Madrigal was Jordan's supervisor at Tyson from approximately March 2017 until October or November. In September, Jordan asked to do an absent employee's job, but Madrigal had already filled the job. When Madrigal told Jordan she could not have the other job, she said she was experiencing some pain, and he took her to the nurses' office. That was the only time that Jordan ever talked to him about hand pain while he was her supervisor. Tyson's counsel asked, "So [Jordan] complained to you of pain after you told her that she couldn't have that job?" And Madrigal responded, "Yeah." After being taken to the nurse, Jordan was put on some temporary light-duty restrictions. But in late September or early October, she came back to her regular job and did not complain of any problems with her hands for the remainder of Madrigal's time as her supervisor.

### (iii) Jordan's Coworker

Maria Magaña worked near Jordan in the packing area at Tyson. In September 2017, after Jordan asked a supervisor to put her in an absent worker's job, but was not put there, Jordan got upset and "said she was going to go to the infirmary to tell the nurse that her hands hurt because he didn't give her the job for that person who didn't show up that day." When asked if Jordan said anything about trying to get the supervisor in some kind of trouble, Magaña responded, "Yes. . . . [S]he said because he didn't change her to that easier job, she was going to go get him fired because it was all his fault that her hands were hurting." When asked if Jordan also made a comment a little bit later about her plans to go to a doctor, Magaña responded, "Yes. She said she was going to go to the doctor and tell him that he should put her on disability so that the company would have to pay her compensation because of being injured." On rebuttal, Jordan denied that she told Magaña that she was going to get a doctor to put her on disability. According to Magaña, Jordan was put on light duty for a while, and then came back to "[t]he same job." Since going back to that same job, "[Jordan] only complains when she sees that another person has come into packing, and then she asks for them to change her to another position from the one she's at, to change her away from having to do the ice." Jordan "tends to complain just about when it is that she wants another job, when she's looking for an easier job that's not packing."

### (c) Medical Evidence

On August 7, 2013, Jordan reported to Tyson that she was having pain in her bilateral shoulders down to her hands "from performing job Whiz Pate." She was assigned restrictions for the performance of her duties. Jordon sought treatment from various providers and was later

- 4 -

diagnosed with carpal tunnel syndrome. She eventually underwent carpal tunnel release surgeries for each hand with Dr. Bruggeman in December 2016.

Records from Dr. Bruggeman show that at a followup exam on February 27, 2017, Jordan was "doing 'okay.'" "She has aching at the incisions. She does physical therapy, massages and works with ultrasound and she feels a funny feeling in her arm, pain with finger extension and pain at night. She feels weak." "She would like to return to her regular job, but bid on another job." Dr. Bruggeman stated, "We will go ahead and *release* [*Jordan*] *back to work without restrictions*. She has specifically requested to remove the no wizard knife restriction. I think that is fine. We will place her *at MMI* and see her back if needed." (Emphasis supplied.) On March 28, Dr. Bruggeman filled in a letter questionnaire from Tyson indicating that Jordan sustained a 3-percent permanent partial impairment for each wrist.

On April 6, 2017, Jordan returned to Dr. Bruggeman. He noted that she "seems to have done well on the left side. However, she continues to have pain and tingling on the right." The plan was to obtain an MRI to assess the anatomy of the carpal tunnel. Dr. Bruggeman's notes from a visit with Jordan on April 18 state that the MRI showed "ligamentous release." "There is scarring in the previous site of the ligament and the median nerve and carpal tunnel contents are bowing, indicating the complete release. The median nerve does have higher signal on the MRI indicating neuritis." Dr. Bruggeman gave Jordan a Kenalog/lidocaine injection in the carpal tunnel of the right wrist. Jordan was returned to work without restrictions. On June 29, Tyson's counsel wrote a letter to Dr. Bruggeman, noting the injection to Jordan's right carpal tunnel on April 18. Counsel asked, "Does it remain your opinion that Ms. Jordan does not require any functional restrictions with regard to her hands?" Dr. Bruggeman checked "Yes," and signed the letter.

Dr. Bruggeman's September 21, 2017, notes reflect that Jordan "has had worsening right shoulder, elbow, neck, hand and spine pain, numbness and tingling." At the time, Jordan was working in box variety meats at Tyson, which required her to put different products in a box, fill it with dry ice, and then push the box so it could go to the cooler. "It is bothersome shoveling with a large spoon five pounds of dry ice per scoop with thousands of repetitions. She is unsure if the injection helped." Her pain severity was reported as a 5 on a scale of "0-10." "Her symptoms are well outside of what we would expect for carpal tunnel syndrome and these symptoms are quite diffuse. I have suggested an FCE, a steroid taper, and temporary restrictions depending on the outcome of the FCE."

The FCE was performed by Neal Wachholtz at Excel Physical Therapy on October 4, 2017; the findings were summarized in a letter to Dr. Bruggeman dated October 11. Wachholtz stated that Jordan "was cooperative during the testing process but demonstrated findings of inconsistent and submaximal effort." Jordan's "subjective complaints of pain appear out of proportion with her objective findings of dysfunction." And "[Jordan's] findings during this examination were not consistent with anatomical and physiological principles. Analysis of multiple validity criteria indicates that the test results are INVALID. Accurate functional restrictions cannot be outlined based on an invalid exam." Wachholtz stated, "It may be appropriate to consider release without restrictions unless you [Dr. Bruggeman] feel they are necessary based on your assessment of her surgical outcome. I would . . . defer to your opinion for final recommendations." A "Work Status"

document signed by Dr. Bruggeman on October 12 stated that Jordan may return to work without restrictions. There was a notation that the "packing job seems to be a good fit."

Dr. Dean K. Wampler, a certified Independent Medical Examiner, completed an independent medical records review of Jordan; he sent a letter to Tyson's counsel dated August 8, 2018, with his findings. After setting out a summary of Jordan's injury and subsequent complaints and treatments, Dr. Wampler stated, "I agree with Dr. Bruggeman's assessment of maximum medical improvement and his assignment of permanent [partial] impairment [of 3 percent to each hand or wrist]." "I also agree with Dr. Bruggeman that, in spite of Ms. Jordan's excessive and bizarre subjective symptom complaints, no limitations or restrictions on upper extremity or hand use are medically warranted."

### 3. WORKERS' COMPENSATION COURT AWARD

The compensation court issued its award on November 30, 2018. The court noted that the parties stipulated that Jordan was employed by Tyson on or about August 7, 2013, and her average weekly wage at that time was $523.84; the court accepted the stipulation.

The compensation court stated, "Although [Jordan] claims a multitude of bodily injuries, the Court finds she has only proven by a preponderance of evidence injury to her bilateral hands and right elbow"; "[a]s for the claim of injury to the shoulders, back, and legs . . . [Jordan] failed to meet her burden of proof." The compensation court found that Jordan sustained an accident arising out of and in the course of her employment with Tyson on August 7, 2013, when she reported pain in her bilateral shoulders down to her hands while performing the Whiz Pate job and was placed on modified duty. She was later diagnosed with carpal tunnel syndrome, and her symptoms were not adequately addressed until the carpal tunnel release surgeries in December 2016. The court found Jordan was entitled to temporary total disability when she was unable to work because of her surgeries; she was awarded 2 4/7 weeks at $349.23 per week, for a total of $897.87.

The compensation court noted that following the surgeries, Jordan had been released to work without any restrictions and was assigned a 3-percent impairment to each hand. However, Jordan claimed that her subjective complaints of pain should weigh heavily in her favor to support a loss of earnings under § 48-121(3). The compensation court "noted several inconsistencies and contradictions" in the evidence to find Jordan's complaints "not credible." "After considering all the testimony and written evidence, the Court, in its discretion, [did] not find [Jordan] sustained a loss of earning capacity of at least 30% or that the impairment ratings [did] not adequately compensate her for her injuries." Thus, the court found Jordan was "entitled to permanent partial disability benefits in the amount of $3,666.92 (175 weeks × 3 percent × 2 × $349.23) for the 3-percent impairment to the right hand and the 3-percent impairment to the left hand as assigned by Dr. Bruggeman." "There is no evidence of permanent impairment for the elbow so no separate award of benefits shall be issued."

The compensation court also ordered Tyson to pay certain medical expenses incurred by Jordan in her treatment of her injury, and that Tyson was entitled to a credit for any indemnity and medical benefits previously paid. And the court specifically stated that "no award for future medical shall be issued."

Jordan now appeals.

### III. ASSIGNMENT OF ERROR

Jordan assigns the compensation court was clearly wrong in finding that she was not entitled to be compensated for a loss of earning power for her bilateral hand injuries.

### IV. STANDARD OF REVIEW

A judgment, order, or award of the compensation court may be modified, reversed, or set aside only upon the grounds that (1) the compensation court acted without or in excess of its powers; (2) the judgment, order, or award was procured by fraud; (3) there is not sufficient competent evidence in the record to warrant the making of the judgment, order, or award; or (4) the findings of fact by the compensation court do not support the order or award. *Martinez v. CMR Constr. & Roofing of Texas*, 302 Neb. 618, 924 N.W.2d 326 (2019).

An appellate court is obligated in workers' compensation cases to make its own determinations as to questions of law. *Id*. Findings of fact made by the Workers' Compensation Court after review have the same force and effect as a jury verdict and will not be set aside unless clearly erroneous. *Id*.

As the trier of fact, the Workers' Compensation Court is the sole judge of the credibility of witnesses and the weight to be given their testimony. *Id*.

### V. ANALYSIS

Section 48-121(3) states in relevant part:

For disability resulting from permanent injury of the following classes, compensation shall be . . . . For the loss of a hand, sixty-six and two-thirds percent of daily wages during one hundred seventy-five weeks. . . .

In any case in which there is a loss or loss of use of more than one member or parts of more than one member set forth in this subdivision, but not amounting to total and permanent disability, compensation benefits shall be paid for the loss or loss of use of each such member or part thereof, with the periods of benefits to run consecutively. . . .

Accordingly, the Workers' Compensation Court found Jordan was "entitled to permanent partial disability benefits in the amount of $3,666.92 (175 weeks × 3 percent × 2 × $349.23) for the 3-percent impairment to the right hand and the 3-percent impairment to the left hand as assigned by Dr. Bruggeman."

However, Jordan claims she should have been compensated for her bilateral hand injury on a loss of earning power basis as allowed under § 43-121(3). In addition to the language set forth above, § 43-121(3) states:

If, in the compensation court's discretion, compensation benefits payable for a loss or loss of use of more than one member or parts of more than one member set forth in this subdivision, resulting from the same accident or illness, do not adequately compensate the employee for such loss or loss of use and such loss or loss of use results in at least a thirty percent loss of earning capacity, the compensation court shall, upon request of the employee, determine the employee's loss of earning capacity consistent with the process for such determination under subdivision (1) or (2) of this section, and in such a case the employee shall not be entitled to compensation under this subdivision.

When determining a loss of earning capacity for an injured worker, the four factors to consider under § 48-121 are the worker's (1) eligibility to procure employment generally, (2) ability to earn wages, (3) ability to hold a job obtained, and (4) capacity to perform the work in the job in which the worker is engaged. *Martinez v. CMR Constr. & Roofing of Texas, supra.*

The compensation court noted that following the surgeries, Jordan had been released to work without any restrictions and was assigned a 3-percent impairment to each hand. Despite Jordan's claims that her subjective complaints of pain should weigh heavily in her favor to support a loss of earning capacity under § 48-121(3), the compensation court "noted several inconsistencies and contradictions in the evidence" to find Jordan's complaints "not credible." Among the "inconsistencies and contractions" noted by the compensation court was that at trial, Jordan claimed her pain level was a 10, meaning the worst pain imaginable. However, "[t]he Court watched [Jordan] intently throughout the proceedings, and she seemed more bored than in pain. In other words, the Court did not find she was in extreme pain or in any discomfort at all, contrary to her assertions." Additionally, Jordan testified that because of her injuries she was unable to carry groceries into her house and had to have someone help her with that task. But the court noted "the surveillance video showed a much different version of her capabilities." The court also noted "testimony from co-workers that [Jordan's] complaints would wax and wane with perceived difficulties she was having with her boss or co-workers." Finally, the court stated that none of the medical evidence supported Jordan's subjective complaints, "which one doctor described as 'excessive and bizarre.'" "More importantly, Jordan has no permanent work restrictions for her injuries, and no physician has said she is incapable of full-duty, unrestricted work." "After considering all the testimony and written evidence, the Court, in its discretion, [did] not find [Jordan] sustained a loss of earning capacity of at least 30 [percent] or that the impairment ratings [did] not adequately compensate her for her injuries."

Jordan argues that "[t]he trial court clearly erred in disregarding the more or less undisputed evidence that [her] wrist injuries lead to a substantially diminished ability to work which was reflected in her assignment to less strenuous jobs by [Tyson]." Brief for appellant at 3. We disagree with Jordan's assessment of the record. The record reflects that Dr. Bruggeman placed her at MMI in February 2017, and she was released to work with no restrictions. She continued to complain of pain, and for periods of time was given temporary restrictions pending further study (e.g., MRI or FCE), however she was always returned to unrestricted work once the study results were received. And as noted by the compensation court, "no physician has said [Jordan] is incapable of full-duty, unrestricted work." Additionally, there was testimony that following her surgeries, Jordan would only complain of hand pain *after* she was not able to move to a different job or when she was not getting along with her coworkers. As the trier of fact, the Workers' Compensation Court is the sole judge of the credibility of witnesses and the weight to be given their testimony. *Martinez v. CMR Constr. & Roofing of Texas*, 302 Neb. 618, 924 N.W.2d 326 (2019). The compensation court did not find Jordan to be a credible witness. The record supports the compensation court's decision to not compensate Jordan based on a loss of earning capacity as allowed under § 48-121(3), thus its decision will not be reversed. See *Martinez v. CMR Constr. & Roofing of Texas, supra.*

## VI. CONCLUSION

For the reasons set forth above, we affirm the decision of the compensation court.

AFFIRMED.